FILED
2014 Sep-26  AM 10:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **JACKIE LANELL MCBRAYER,** ) | |
| ) | |
| **Claimant** ) | |
| ) | |
| **v.** ) | **CASE NO.: 2:13-CV-00443-KOB** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **as acting Commissioner of the Social** ) | |
| **Security Administration**, ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January 18, 2010, the claimant, Jackie Lanell McBrayer, applied for a period of disability and disability insurance benefits under Title II of the Social Security Act. (R. 12). She alleges disability commencing on January 1, 2009, because of fibromyalgia, depression, high blood pressure, and sleep apnea. (R. 112). The Commissioner denied both claims on October 7, 2010. (R. 92-97). The claimant filed a timely request for a hearing before an Administrative Law Judge on October 19, 2010. (R. 111). The ALJ held a hearing on October 19, 2011. (R. 12).

In a decision dated October 27, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, ineligible for disability insurance benefits. (R. 27). On January 2, 2013, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-7). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). Because the ALJ failed to

address the severity of the affects of her sleep apnea at any step in his decision, and for the reasons stated below, this court reverses the decision of the Commissioner and remands for further consideration consistent with this opinion.

## II. ISSUES PRESENTED

The claimant presents one issue for review: whether the ALJ committed reversible error by failing to discuss or evaluate the affects of the claimant's sleep apnea during step two or any other step of the sequential evaluation process.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm the Commissioner's decision if he applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must remember that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner

because they are administrative findings that are dispositive of a case; i.e, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports the finding.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?

    (2) Is the person's impairment severe?
    (3) Does the person's impairment meet or equal one of the specific impairments
    set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
    (4) Is the person unable to perform his or her former occupation?
    (5) Is the person unable to perform any other work within the economy?

    An affirmative answer to any of the above questions leads either to the next
    question, or, on steps three and five, to a finding of disability.  A negative answer
    to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ may find an impairment non-severe "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work . . . ." *Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x. 855, 857 (11th Cir. 2013) (quoting *McDaniel*, 800 F.2d at 1031). Only the most trivial impairments should be rejected as non-severe. *Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011) (quoting *McDaniel*, 800 F.2d at 1031). Failure to recognize an impairment at step two as a severe impairment constitutes reversible error only if the ALJ fails to fully account for the functional limitations arising from that impairment in subsequent steps.  *See Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 901 (11th Cir. 2011). *See also Hanson v. Colvin*, No. 11-1073, slip op. at *6 (M.D. Al. 2013) (quoting *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x. 823, 825 (11th Cir. 2010)); *Delia*, 433 F. App'x at 887.

## V. FACTS

The claimant has a high school education, and was sixty-two years old at the time of the administrative hearing. She was working part-time as a day-care provider at the time of the hearing. (R. 35-36). The claimant alleged that she was disabled by fibromyalgia, depression,

sleep apnea, and high blood pressure. (R. 112).

*Physical and Mental Limitations*

On August 7, 2003, the claimant visited Dr. Stuart J. Padove of the Princeton Pulmonary Group P.C., complaining of fatigue, excessive daytime sleepiness, and sleep attacks during the day. Dr. Padove noted the possibility that fibromyalgia caused her sleep apnea. A sleep study conducted on August 20, 2003 reported obstructive sleep apnea syndrome, and Dr. Padove recommended a CPAP and weight loss to alleviate her sleep apnea. (R. 183-96).

The record contains no medical evidence from the dates between August 2003 and March 2008.

On March 7, 2008, the claimant visited Dr. John Holcombe, a physician at the University of Alabama at Birmingham's Kirklin Clinic, as a follow-up for high blood pressure and chronic pain. He noted that she took Cardizem LA 360mg, Toprol XL 100mg, and Hyzaar 100/25 for high blood pressure; Effexor 75mg for depression, and Ultram 50mg for pain. Dr. Holcombe noted that she had decreased energy, more headaches, chronic pain, and worsening fibromyalgia. He also reported the ineffectiveness of Lyrica in treating the claimant's fibromyalgia. Dr. Holcombe indicated that the claimant suffered from right knee tendinitis, fibromyalgia, depression, and adequately-controlled hypertension. Dr. Holcombe prescribed Topamax 25mg for neuropathic pain and pain managment, and recommended that she diet to help lose weight. (R. 234).

The claimant visited Dr. Holcombe for anxiety, depression, fibromyalgia, hyperlipidemia, and hypertension on July 17, 2008; November 2, 2008; and December, 3; 2008. On July 17, 2008, the claimant felt "very depressed." Dr. Holcombe reported that she no longer took

Topamax, but Ultram seemed to help alleviate her pain. Dr. Holcombe refilled her Effexor-XR 75mg, and he prescribed Fluoxetine 20mg and Wellbutrin 300mg for depression. Dr. Holcombe advised the claimant to see a psychiatrist, noting that "she is worsening to the point in need of that expertise." (R. 231). On November 3, 2008, the claimant told Dr. Holcombe that she felt adequately treated with Effexor-XR 75mg, but that the Ultram could not control her chronic pain. Dr. Holcombe prescribed Flexeril 10mg to relax her muscles and Lorcet 7.5 for her pain. He refilled her prescription for Effexor-XR. (R. 228). On December 3, 2008, Dr. Holcombe reported that her depression had not worsened since the previous visit, and that her pain was "much improved." He found her chronic pain, fibromyalgia, and depression to be stable while on Lorcet. He refilled her Lorcet 7.5 prescription, and recommended a follow-up. (R. 226).

On April 9, 2009 and May 15, 2009, Dr. Holcombe reported that the claimant continued to complain of depression, chronic pain, and chronic fatigue. (R. 224-25). On May 15, 2009, the claimant informed Dr. Holcombe of her desire to reduce her Lortab prescription to Lortab 5, with which he complied. (R. 222).

On November 13, 2009, Dr. Holcombe examined the claimant. He noted that she had inadequate control over her hypertension, and also reported that she suffered from fibromyalgia and depression. He prescribed Provigil 100mg for depression, and Lortab 7.5 and Tylenol 1500mg for pain. (R. 219).

On January 8, 2010, claimant visited Dr. Holcombe for her hypertension, chronic pain, depression, and lack of alertness. Dr. Holcombe noted that she controlled her pain well with six Tramadol per day. He also noted improvements in her concentration and energy while taking Provigil, though concentration still proved difficult. (R. 217).

6

On May 7, 2010 and June 28, 2010, Dr. Holcombe reported that the claimant complained of depression and fibromyalgia. On May 7, 2010, Dr. Holcombe noted that the claimant better managed her pain and that her chronic depression was "fairly well controlled." (R. 215). On June 28, 2010, the claimant reported that her mood stability varied more than previously, and that her pain had increased as a result of worsening stress with her mother and sister. Dr. Holcombe increased her daily dosages of Effexor and Ultram. (R. 280).

On August 10, 2010, Dr. Abiodun Philip Badewa, a psychiatrist and doctor at Utmost Healthcare Center, examined the claimant at the request of the Disability Determination Service. Dr. Badewa reported that while the claimant described aching, chronic, constant, and tender pain, it only moderately limited her activities. He described her depression similarly. While the claimant described it as chronic, constant, and worsening, Dr. Badewa found her depression to only moderately limit her activities. He reported moderate arthritis in her hips, knees, and feet as well as crepitus in her knees. Finally, the claimant told Dr. Badewa that, while she had chronic, primary hypertension, her medications stabilized the high blood pressure. He reported her hypertension as mild. Dr. Badewa diagnosed her with depression, polyarthritis, and fibromyalgia. (R. 237-242).

On November 4, 2010, Dr. Holcombe reported that the claimant had not regularly taken Pravastatin, and instead switched her to Crestor 5mg for hyperlipidemia. He noted fibromyalgia, hyperlipidemia, hypertension, and severe depression. He also referred her to a Christian psychiatrist as she requested. (R. 278).

On January 13, 2011, the claimant reported that she was not doing well. During her visit with Dr. Holcombe, she recounted the abusive relationship she had with her second ex-husband,

to whom she was married for twelve years. Dr. Holcombe again recommended that the claimant see a psychiatrist, noting that she suffered from severe depression, a possible personality disorder, and fibromyalgia. Dr. Holcombe prescribed Lortab 10, and continued the claimant on her other medications. (R. 276).

On April 14, 2011 and May 18, 2011, Dr. Holcombe reported the stability of the claimant's depression and fibromyalgia. On April 14, 2011, the claimant informed Dr. Holcombe that she managed her pain fairly-well. He also reported that she had good control over her hypertension at home. He prescribed Norco 5 instead of Lortab for pain, and refilled her Venlafaxine 150mg (the generic for Effexor-XR), Toprol XL 100mg, Hyzaar 100/25, and Diltiazem ER 360mg. (R. 275). On May 18, 2011, Dr. Holcombe noted no other concerns or complaints from the claimant. (R. 274).

In an undated disability report, the claimant alleged that fibromyalgia, depression, sleep apnea, and high blood pressure limited her ability to work. She reported that her impairments had reduced her strength, caused her pain, and limited her performance of daily activities. The claimant stated that she had not had substantial gainful employment since the onset of her disability, which occurred on January 1, 2009. However, she reported that she had worked as a daycare provider since 1991, and performed duties including feeding and changing the infants and cleaning the daycare facilities. She noted that during her six-hour workday, she would spend approximately three and a half hours walking, two hours sitting, and half an hour standing. She also noted that she spent an hour handling, grasping, or grabbing big objects; half an hour stooping; half an hour kneeling; half an hour crouching; half an hour writing, typing, or handling small objects; and no time crawling. (R. 112-16).

8

In an undated function report, the claimant reported her daily activities. She would stay in bed until nine or ten, take her medication, and wait until it took effect. The claimant would feed her pets, perform some light house work, do some laundry, and lay back down. She noted that her husband would assist her in caring for her pets. She noted that her pain would sometimes keep her awake. The claimant stated that she could prepare her own food, which included sandwiches, cereal, or leftovers. She also stated that she could do laundry, do the dishes, clean, and iron for ten minute intervals, but that her husband did most of the housework. (R. 136-38).

The claimant also reported in her function report that she can drive, and that she enjoyed reading and watching television. She stated that she goes to church twice a month, goes to the park to watch her grandchildren play ball, and works six hour days three times a week. The claimant reported that she can lift ten to fifteen pounds and will only walk if necessary, as she can only walk a few feet at a time. She also reported that, at work, she sits as much as she can. The claimant noted that she can pay attention for a normal amount, but that she will "go blank in conversations at times." She also noted that she has to stop while reading, watching television, and doing chores to rest. Finally, she reported her ability to follow written and spoken instructions as "fair." (R. 138-43).

*Mental Limitations*

In addition to the above mentioned mental findings by Drs. Badewa and Holcombe, on August 23, 2010, Dr. William B. Beidleman, a psychologist, performed a mental evaluation of the claimant at the request of the Disability Determination Service. Dr. Beidleman diagnosed the claimant with late onset dysthymic disorder, a mild but chronic form of depression. He assigned her a GAF score of 59. He reported that she could function independently and remember simple

job instructions. Dr. Beidleman also reported that claimant controlled her chronic anxiety fairly well. He then assessed the claimant's mental functional limitations. Dr. Beidleman found that her depression and anxiety had a mild degree of limitation on her daily living and maintaining of social functioning. He also found that her anxiety and depression had a moderate degree of limitation on maintaining concentration, persistence, or pace. He finally noted that she did not have any episodes of decompensation. (R. 244-59).

In his mental residual functional capacity determination of the claimant, Dr. Beidleman found that the only areas in which the claimant's depression moderately limited her were the ability to remember and understand simple and detailed, but not complex, instructions, and the ability to sustain attention or concentration for two hour periods to complete a regular workday at an acceptable pace and attendance schedule. (R. 244-72).

On October 1, 2010, Dr. Steven D. Dobbs, a state agency psychologist, performed a mental evaluation of the claimant. He reported that the claimant suffered from affective and anxiety-related disorders. Dr. Dobbs diagnosed the claimant with dysthymia and chronic anxiety that was fairly-well controlled. Dr. Dobbs determined that the claimant's mental limitations only mildly limited her activities of daily living and maintenance of social functioning. He found that her mental limitations moderately limited her ability to maintain concentration, persistence, or pace. He finally found that her mental limitations did not cause any episodes of extended decomposition. Dr. Dobbs reported that medical evidence did not establish the presence of paragraph C criteria. He finally concluded that evidence cannot support the findings that the claimant suffers from a mental disability, as she suffers from only mild to moderate limitations. (R. 247-60).

10

*The ALJ Hearing*

On October 7, 2010, the Commissioner determined that the claimant was not disabled and denied the claimant's application for disability insurance benefits and supplemental security income. (R. 58-60). The claimant timely filed a written request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on October 19, 2011. (R. 20).

At the hearing, the claimant discussed four alleged impairments: depression, fibromyalgia,  high blood pressure, and sleep apnea. As a result of these impairments, the claimant testified that she experienced significant fatigue. The claimant further articulated that she experienced excruciating pain throughout her body. At the hearing, the claimant experienced pain in her arm, leg, and back muscles. The claimant testified that at its worst, she would rate her pain as a 10 on the pain scale. When she could control it, the claimant testified that she would rate it as a five. She stated that stress would make the pain even worse. (R. 40-41, 45-46).

The claimant stated that she lived with her husband in her aunt's house. They previously lived in their own home, but the tornado in April of 2011 destroyed it. The claimant's husband worked for the Road Department of Jefferson County. Her husband's income had increased due to his Social Security benefits. She testified that because of the substantial likelihood of her husband retiring in the next year or two, she felt a financial need to keep working. However, due to her depression and fibromyalgia, she struggled to continue to work. (R. 39-40, 48-49).

The claimant testified that she had worked only as a daycare worker in the previous fifteen years. She also testified that she worked 7:00 AM to 1:00 PM on Mondays, Tuesdays, and Wednesdays. While working, she stated that she dealt primarily with infants ages six weeks to one year old. The claimant articulated that she would change diapers, as well as hold and lift the

11

infants. Throughout the day, the claimant would also place infants on her hip and walk with them, or place them in jumpers attached to the body. The claimant testified that she prepared meals for the infants and heated their bottles. After work, she would go straight to bed. The claimant also testified that she knew she could not work a fourth day a week, and had previously considered cutting back her hours to just two days per week. (R. 36-39).

On her off days, the claimant testified that she performed housework and laid in bed. She stated that she could and did drive, including to and from work. She explained that she could cook easy meals, but that her husband performed most of the cooking. (R. 37, 50).

The claimant testified that both the fatigue and the depression prevented her from completing her daytime work. She testified that she has to sit down and rest throughout the day, and that her employer had not made any accommodations for her. The claimant stated that she spent her day sitting for two hours, and walking the remaining time. She testified that she could sit for thirty minutes at a time, stand for twenty minutes at a time, and walk for a whole block. If she sat for more than thirty minutes, she explained that she gets uncomfortable and stiff. If she stood for twenty minutes or walked a block, she needed to sit because of pain and fatigue. In addition, she discussed that she could not perform a full-time sedentary job because she would get stiff. (R. 43, 46, 49).

The claimant stated that she uses the CPAP machine, but did not tolerate it very well due to her claustrophobia. Instead, she relied on sleeping medication provided by Dr. Holcombe to help her use the CPAP. She testified that she normally slept six to eight hours each night, in addition to the sleep she would get after she returns from work. Despite this amount of sleep, the claimant stated that she still struggles to get out of bed. (R. 44-45).

When asked by her counsel if factors other than her pain and fatigue could contribute to her depression, the claimant testified that the health of her son, her mother, and her mentally challenged sister all weighed heavily on her mind, and that the destruction of her home also contributed. (R. 43-44).

To treat her depression, she took Effexor, which the claimant testified helped her to cope with her depression.  She stated that although she took Lortab and Ultram for her pain, they only dulled it. She testified, however, that Dr. Holcombe had never limited her daily activity. (R. 47, 48, 51).

Next, Dr. David Head, a vocational expert with a PhD in rehabilitation counseling, testified as to the ability of the claimant to work. Dr. Head characterized the claimant's sole job as a daycare worker, and that the Dictionary of Occupational Titles described it as medium in exertion and unskilled. Dr. Head stated that because the claimant dealt primarily with infants, and never lifted more than twenty pounds, she performed the occupation with light exertion, but still unskilled and without transferable skills. (R. 51).

The ALJ then hypothesized a woman with the same age, education, and past work experience as the claimant. The ALJ further added that this woman experienced moderate pain that affected her ability to concentrate; moderate depression; and moderate fatigue. Dr. Head testified that such a hypothetical woman could perform work at a medium exertion level. Dr. Head also testified that she also could perform light work as well. (R. 52).

Dr. Head then examined the various levels of pain and how those levels would affect an individual's ability to perform work. Dr. Head stated that there are four types of pain: mild, moderate, moderately severe, and severe. Dr. Head testified that individuals who experience mild

to moderate pain can work. Because the physical and psychological demands of moderately severe to severe pain result in limitations on individuals' attention span, concentration, range of motion, and attendance, those individuals suffering from such pain could not work. (R. 52-53).

In addition, Dr. Head testified that psychiatric or psychological impairments, including depression, can affect specific work behaviors. He noted limitations in attention and concentration; understanding and following work instructions; tolerating stress; and relating appropriately to supervisors, other workers, and the general public. If an individual's psychiatric or psychological impairments were mild to moderate, then Dr. Head found that the individual could still work. If, however, the psychiatric or psychological impairments occurred on a chronic basis, then Dr. Head stated that the effect on concentration, attention span, and relationships would prevent the individual from working. Dr. Head concluded by testifying that an individual could not miss more than twenty workdays a year, or no more than two workdays a month for an extended period of several months, to compete for such work. (R. 53).

*The ALJ's Decision*

On October 27, 2011, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 28). First, the ALJ found that the claimant met the insured status requirement of the Social Security Act through December 31, 2013. Second, although the ALJ found that the claimant worked after the alleged disability onset date, he found that the claimant's earnings did not rise to the level of substantial gainful activity. Third, the ALJ found that the claimant suffered from the severe impairments of obesity, fibromyalgia, and depression. However, he stated that the claimant had not demonstrated that her impairments or combination of impairments met or equaled the severity of one of the listed impairments in 20

14

CFR §§ 404.1520(d), 404.1525, and 404.1526. (R. 22).

The ALJ first discussed the claimant's obesity and accompanying impairments. The ALJ found that, despite the claimant's allegations that her obesity contributed to pain throughout her body, no treating or examining physician placed any limitations on her ability to work. The ALJ then concluded that her obesity did not significantly interfere with her ability to perform physical activities or routine movements consistent with the RFC that he later discussed. (R. 23).

The ALJ then examined the severity of the claimant's mental limitations. He initially stated that "no treating, examining, or reviewing physician suggested the existence of any medical or mental impairment, or combination of impairments, that met or equaled the criteria of any listed impairment." He then examined the claimant's depression. (R. 23).

The ALJ noted that for the claimant's depression to meet or equal the severity of the listed impairments, it must result in at least two of the following: marked restrictions in daily living; marked restrictions in social functioning; marked difficulties in concentrating, persisting, or pacing; or repeated episodes of decompensation, each of extended duration. (R. 23).

In the area of daily living, the ALJ found that the claimant experienced mild restrictions. The ALJ noted that in the claimant's function report, she stated that she could feed her pet; perform light household chores, including laundry, cleaning, and ironing; independently tend to her personal care, prepare simple daily meals; drive a car; shop for groceries; attend church; and work eighteen hours a week. In addition, the ALJ examined Dr. Badewa's finding that, while the claimant experienced severe impairments, they only moderately limited her activities. (R. 23).

In the area of social functioning, the ALJ found that the claimant experienced mild restrictions. He found that the claimant could still attend church, shop for groceries, visit the

15

park, and work three days a week. The ALJ noted the importance of social functioning in the claimant's ability to perform her duties as a daycare provider. Because of this importance and her continued ability to carry out her daily activities, the ALJ concluded that the claimant's limitations were less than alleged. (R. 23).

In the area of concentration, persistence, or pace, the ALJ found that the claimant experienced moderate difficulties. The ALJ stated that in her function report, the claimant reported that she enjoyed reading and watching television. The ALJ then examined Dr. Dobbs' clinical notes regarding the claimant's mental limitations. The ALJ found that Dr. Dobbs noted the claimant's moderate limitations in her ability to understand; remember and carry out detailed instructions; maintain concentration and attention for extended periods of time; and perform activities within a schedule, maintain regular attendance, and arrive on time. Regarding all other remaining factors relevant to the area of functioning, the ALJ determined that Dr. Dobbs reported no significant limitations caused by her mental impairments. (R. 23-24).

Finally, in the area of decompensation, the ALJ found that the claimant had not experienced an episode of extended duration. The ALJ concluded that because the claimant's mental impairments did not cause at least two marked limitations, or one marked limitation and repeated, extended episodes of decompensation, her impairments did not satisfy the "paragraph B" criteria. (R. 24).

The ALJ next considered whether the claimant established "paragraph C" criteria. The ALJ determined that the claimant needed to present medical evidence that the disorder lasted at least two years in duration, had caused more than a minimal limitation on her ability to do basic work activity, and attenuated symptoms as a result of medication or psychosocial support. The

ALJ also concluded that the claimant needed to demonstrate that she experienced extended episodes of decompensation; that increased mental demands would cause such an episode; or that she had a current history of one or more years of an inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement. (R. 24).

The ALJ examined the claimant's reports, and determined that she remained capable of attending church, going shopping, and visiting the park. He found that the claimant would not perform these activities if she lived in a highly supportive living arrangement. The ALJ found that the claimant failed to provide any evidence to suggest that she could not function outside of her home. He also concluded that she failed to provide evidence that she experienced episodes of decompensation, or that such episodes would occur if she increased her mental demands. (R. 24).

The ALJ explicitly noted that the limitations discussed for the purposes of determining "paragraph B" criteria did not qualify as a RFC assessment. The ALJ noted that he instead used them to determined the severity of the mental impairments at steps two and three of the sequential evaluation process. (R. 24).

The ALJ then examined the record to determine the claimant's RFC. He evaluated the claimant's statements under the pain standard. The ALJ noted that in the claimant's disability report, she claimed she was disabled because of fibromyalgia, depression, high blood pressure, and sleep apnea. In her function report, the ALJ noted that the claimant experienced difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, remembering information, and completing tasks. The ALJ also noted that the claimant alleged that she felt excruciating pain throughout her entire body because of her fibromyalgia; that she

experienced pain she would rate at a five when controlled, but a ten when not under control; and that she could not sit for long periods, as she would become uncomfortable and needed to move around. While the ALJ found that her underlying medical and mental impairments could reasonably be expected to cause the alleged symptoms, he found the claimant's statements regarding the intensity, persistence, and limiting effects lacked credibility to the extent they conflicted with the residual functional capacity assessment. (R. 25).

First, the ALJ examined the claimant's work history. The ALJ noted that the claimant explained to her physicians that she "lift[ed] babies at work" and that she had worked as a daycare provider on a part-time basis at the First Baptist Daycare for the previous nineteen years. The ALJ stated that the claimant's work included back-and-forth walking, lifting infants, changing diapers, and preparing bottles. Despite her diagnosis of fibromyalgia on January 22, 2009, and potentially as early as August 7, 2003, the ALJ found that she continued to work as a daycare provider. The ALJ also found that Dr. Badewa reported that the claimant had a normal musculoskeletal and extremities examination, with the exception that she had crepitus in her knees. The ALJ concluded that the record demonstrated the stability or reasonable stability of the claimant's pain. (R. 26).

The ALJ also found that she continued to work as a daycare provider despite her life-long struggle with depression. The ALJ discussed Dr. Beidleman's findings, which concluded that the claimant suffered from late onset dysthymic disorder. The ALJ also noted that Dr. Beidleman assigned the claimant a GAF score of 59 that reflected that she experienced only moderate symptoms or difficulties in the areas of social, occupation, or school functioning. (R. 26).

Second, the ALJ noted that the claimant's medication mitigated the limitations and

difficulties caused by her impairments. The ALJ examined Dr. Holcombe's clinical notes, and determined that the claimant's medication controlled her symptoms. The ALJ discussed that the clinical notes from the claimant's May 7, 2010 visit with Dr. Holcombe indicated that the claimant had control over her pain and depression, and reported depression and anxiety as fairly well controlled. The ALJ took special note of the claimant's April 9, 2009 request to reduce her pain medication from Lortab to Lortab 5. On a September 2, 2010 visit with Dr. Holcombe, the ALJ noted that Dr. Holcombe's clinical notes reported the claimant's pain as reasonably stable and her depression improved with the use of Venlafaxine. The ALJ discussed her April 14, 2011 visit, in which Dr. Holcombe diagnosed the claimant with reasonably stable anxiety and depression, and stable fibromyalgia. Finally, the ALJ examined her May 18, 2011 visit, where Dr. Holcombe described the claimant as doing well on Narco and Venlafaxine regarding her pain and depression, respectively. (R. 26-27).

Third, the ALJ considered the claimant's daily activities. The ALJ noted that the claimant's daily activities, including her ability to work, shop for groceries, attend church, and visit the park, demonstrated that she did not suffer from any disabling pain or limitations.

The ALJ stated that he gives great weight to the determinations of the consultative examiners, Drs. Badewa and Beidleman. The ALJ explained that both physicians examined the claimant's medical records, interacted with the claimant, and supported their opinions with objective medical evidence. The ALJ further articulated that both medical reports were consistent with the record as a whole.  (R. 27).

The ALJ concluded that the medical records of the claimant supported the RFC assessment, and concluded that the evidence did not corroborate the claimant's alleged inability

19

to perform substantial gainful activity. The ALJ found that the claimant alleged a greater degree of debilitation than what the evidence could support. (R. 27).

The ALJ then determined that the claimant could perform her past relevant work as a daycare worker, which the DOT classified as unskilled work with an SVP rating of two and generally performed at the medium exertion level. The ALJ found that the claimant's work as a daycare provider did not require the performance of work-related activities precluded by the claimant's residual functional capacity.

In making his determination, the ALJ relied on the vocational expert Dr. Head. The ALJ found that Dr. Head indicated that moderate pain did not prevent an individual from carrying out the duties required in the workplace. The ALJ also noted that Dr. Head testified that moderate limitations to functional areas do not preclude an individual from participating in substantial gainful employment. The ALJ examined the functional areas, which included the ability to pay attention and concentrate; to understand and follow instructions; to tolerate stress; and to relate appropriately to supervisors, co-workers, and the general public. The ALJ found that the claimant exhibited only moderate pain and limitations in these functional areas, and concluded that they did not preclude the claimant from engaging in substantial gainful activity. The ALJ, therefore, determined that the claimant was not disabled. (R. 27-28).

## VI. DISCUSSION

The claimant argues that the ALJ committed reversible error by failing to discuss or evaluate the affects of the claimant's sleep apnea during step two or any other step of the sequential evaluation process. This court agrees.

In step two, the ALJ must determine whether the claimant's impairments qualify as severe. 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ may find that a claimant's impairment qualifies as non-severe only if it represents a slight abnormality and has such a minimal effect that it would clearly not be expected to interfere with the claimant's ability to work. *Sanchez*, 507 F. App'x. at 857 (quoting *McDaniel*, 800 F.2d at 1031). Only if the impairment is trivial should the ALJ consider it non-severe.

In step two, the ALJ determined that the claimant suffered from the severe impairments of obesity, fibromyalgia, and depression. However, the ALJ failed to determine the severity of the claimant's sleep apnea, an impairment alleged by the claimant in her application for disability.

The ALJ erred in failing to determine whether the claimant's sleep apnea constituted a severe impairment. In his August 7, 2003 clinical notes, Dr. Padove reported that the claimant suffered from fatigue, excessive drowsiness, and sleep attacks throughout the day. After the sleep study confirmed that the claimant woke up throughout the night, Dr. Padove diagnosed her with sleep apnea. In the ALJ hearing, the claimant testified that she suffers from "real bad" fatigue throughout the day. She stated that she must use a CPAP machine nightly, but she struggles to do so because of her claustrophobia. To reduce her stress associated with the use of the CPAP machine, the claimant noted that Dr. Holcombe prescribed sleeping medication. Even with the use of the CPAP machine and sleeping pills, the claimant testified that she still struggles to wake up in the morning due to her fatigue. The claimant also explained that her fatigue prevents her from working during the day. The ALJ failed to determine at step two whether her fatigue,

excessive drowsiness, and sleep attacks had a reasonable expectation of interfering with the claimant's ability to work.

If the ALJ fails to evaluate whether an impairment is severe at step two, the error is reversible if he fails to fully account for the impairment's functional limitations during subsequent steps. *See Burgin*, 420 F. App'x. at 903. *See also Hanson*, No. 11-1073, slip op. at *6 (quoting *Heatly*, 382 F. App'x. at 825); *Delia*, 433 F. App'x. at 887. The ALJ's failure to discuss the claimant's sleep apnea in steps three and four of the sequential evaluation process constitutes a reversible error. If the ALJ had discussed the claimant's sleep apnea at any other point in his opinion, the ALJ would not have committed a reversible error. However, the ALJ failed to discuss and evaluate the claimant's sleep apnea at any stage in his decision and, thus, committed a reversible error.

In step three, the ALJ noted that the claimant reported in her disability report that she suffered from depression, fibromyalgia, and obesity. The ALJ's decision stated that he "evaluated the claimants obesity and accompanying impairments," but he failed to articulate what he defined as "accompanying impairments." (R. 23). These "accompanying impairments" may have referred to the claimant's sleep apnea, or it may have simply referenced the other severe impairments he found in step two. Even if the ALJ included the claimant's sleep apnea under "accompanying impairments," the ALJ failed to evaluate how the claimant's sleep apnea interacted with her other impairments to limit her ability to work. The ALJ failed to discuss the full limitations of the claimant's sleep apnea in step three, alone or in conjunction with her other severe and non-severe impairments.

The ALJ never discussed the claimant's sleep apnea, or whether the combination of the claimant's sleep apnea, high blood pressure, obesity, fibromyalgia, and depression equaled or met the severity of one of the listed impairments. He exclusively discussed the claimant's obesity, fibromyalgia, and depression, but he did not fully account for the limitations resulting from her sleep apnea. Therefore, the ALJ failed to evaluate and fully account for the claimant's sleep apnea in step three.

In step four, the ALJ made his only reference to the claimant's sleep apnea by stating that the claimant indicated in her disability report an inability to work because of her fibromyalgia, depression, and sleep apnea. (R. 25). While this demonstrates that the ALJ had knowledge of the claimant's impairment of sleep apnea, the ALJ still failed to consider and evaluate her sleep apnea. The ALJ in the instant case failed to discuss or examine Dr. Paldove's medical opinion regarding her sleep apnea and only acknowledged that the claimant alleged that she suffered from sleep apnea. He failed to evaluate the severity of her sleep apnea and the effect that it had on her ability to continue her work as a daycare provider. The ALJ failed to evaluate her testimony regarding her fatigue and inability to work throughout the day. The ALJ failed to evaluate the claimant's use of the CPAP machine and sleeping pills from Dr. Holcombe. Because the ALJ in this case erroneously failed to consider and evaluate the claimant's sleep apnea as severe in step two, and because he failed to consider and evaluate her sleep apnea throughout steps three and four, the ALJ committed a reversible error.

*Other Concern*

In addition to this issue, this court is concerned about the apparent failure of the ALJ to consider the claimant's sleep apnea and high blood pressure in combination with her other

impairments. In step three, the Commissioner must consider the combined effects of all the claimant's impairments in determining her disability, not merely the individual effects of the several impairments. *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *Walker*, 826 F.2d at 1001; 20 C.F.R. § 416.923. A clear statement by the ALJ that he considered the combined effects of all impairments constitutes an adequate expression that he considered the combined effects of all impairments in determining her disability. *Burgin*, 420 F. App'x. at 903; *Jones*, 941 F.2d at 1533.

In this case, the ALJ stated that "no treating, examining, or reviewing physician ha[d] suggested the existence of any impairment or combination of impairments that would meet or medically equal the criteria of any listed impairment." This court finds that this statement does not qualify as a clear statement that the ALJ *himself* considered the combined effects of all the claimant's alleged impairments. (R. 23). Even if her treating physicians found that the combined effects did not meet or equal a listing impairment, the ALJ still had a duty to evaluate the combined effects himself. Moreover, because the ALJ never discussed or evaluated the claimant's sleep apnea specifically, the court cannot ascertain whether the ALJ's reference to a "combination of impairments" included the sleep apnea that the ALJ never discussed.

Moreover, the court is unclear whether the ALJ examined the claimant's sleep apnea and high blood pressure when he purportedly considered the combination of all the claimant's alleged impairments in determining the severity of her limitations. The ALJ may have included sleep apnea and high blood pressure as symptoms of obesity, depression, or fibromyalgia. However, this court has no way of knowing whether the ALJ included these impairments under obesity because he failed to mention that he had done so.

24

In addition, the ALJ noted that he found that "the claimant's medically determinable impairments" could cause the alleged symptoms, but not of such a severity as alleged by the claimant. However, the ALJ failed to articulate to *which* impairments he referred, whether it included the medically determined sleep apnea that he mentioned once and the medically determined high blood pressure, or simply the obesity, fibromyalgia, and depression. (R. 25).

Because this court cannot determine whether the ALJ properly considered the combined effects of all the claimant's alleged impairments, it urges the ALJ to explicitly discuss, consider, and evaluate the claimant's sleep apnea *and* high blood pressure in steps two, three, and four (and step five if necessary) in its decision on remand.

Because the ALJ failed to evaluate the claimant's sleep apnea in step two, and failed to consider and evaluate her sleep apnea in steps three or four, the court finds that the ALJ failed to apply the proper legal standard and that substantial evidence does not support the ALJ decision.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the ALJ committed a reversible error in applying the proper legal standard and substantial evidence does not support his decision. Thus, his decision is due to be REVERSED and REMANDED consistent with this opinion. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 26th day of September, 2014.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE